## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF MICHIGAN

RITA MORRISSEY, an individual,

       Plaintiff,

v.

LAUREL HEALTH CARE COMPANY, a
Foreign Profit Corporation, and OAK
HEALTH CARE INVESTORS OF
COLDWATER, INC. d/b/a THE LAURELS
OF COLDWATER and d/b/a CARRIAGE
INN CONVALESCENT CENTER, a
Domestic Profit Corporation,

       Defendants.

Case No. 17-cv-00089-JTN-ESC

Hon. Janet T. Neff
Mag. Ellen S. Carmody

**Plaintiff's Response Brief in Opposition to Defendants' Motion for Summary Judgment**

**ORAL ARGUMENT REQUESTED**

---

| | |
|---|---|
| Sarah S. Prescott (P70510) | Karen B. Berkery (P38698) |
| Nakisha N. Chaney (P65066) | Zeth Hearld (P79725) |
| Jennifer B. Salvatore (P66640) | KITCH DRUTCHAS WAGNER |
| SALVATORE PRESCOTT & | VALITUTTI & SHERBROOK |
| PORTER, PLLC | Attorneys for Defendants |
| Attorneys for Plaintiff | One Woodward Ave., Suite 2400 |
| 105 E. Main Street | Detroit, MI 48226-5485 |
| Northville, MI | (313) 965-7448 |
| (248) 679-8711 | karen.berkery@kitch.com |
| prescott@spplawyers.com | zeth.hearld@kitch.com |
| salvatore@spplawyers.com | |
| chaney@spplawyers.com | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## BRIEF IN SUPPORT

## CERTIFICATE OF SERVICE

## PLAINTIFF'S EXHIBITS

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………….…........i

INDEX OF AUTHORITIES…………..……………………………………….…........ii

STATEMENT OF QUESTIONS PRESENTED……………………………………....v

CONTROLLING AUTHORITY……………………………………………………vi

COUNTER-STATEMENT OF MATERIAL FACTS…………………………….…....1

    I.     Defendants Implement an Illegal Blanket Rule of Rejecting All Accommodations……………………………………………………....2

    II.    Plaintiff's Disabilities Necessitate a Medical 12-Hour Work Restriction….……..…3

    III.   Defendants Lean of Morrissey's Disability ……………………………..…..…5

    IV.   The Laurels Mandates Plaintiff to Work More Than 12 Hours……………..……6

    V.    Plaintiff Is Mandated Again and Submits Written Complaint of ADA Violation……………………………………………………………...…..8

    VI.   Defendants Depart from Prior Practice of Returning Nurses to Work and Depart from their Policy of Investigating ADA Complaints………….…………..9

    VII.  Defendants Excused Nurses from Mandation for Non-Disability Reasons………..10

LEGAL ARGUMENT……………………………………………….…………………10

    I.     Plaintiff was Disabled……………………………………………..…...10

    II.    Defendants' Arguments Do Not Substantively Address "Regarded As" or "Record of Disability" Theories & This Means Defendants Do Not Carry their Burden as Movants to Secure Judgment………………..…..…..…..…14

    III.   Defendants Failed to Accommodate Morrissey …………………………...……17

    IV.   Plaintiff Was Subjected to Adverse Actions, Which Support Her Discrimination Claims……………………………………….………………17

    V.    Defendants' Limited Attacks on PWDCRA and ADA Retaliation Claims Are Legally Incorrect and Insufficient to Grant Dismissal………………………...21

RELIEF REQUESTED………………………………………………….…………...24

## INDEX OF AUTHORITIES

**Cases**

*A.C. ex rel. J.C. v. Shelby Cty. Bd. Of Educ.,*
    711 F.3d 687, 698 (6th Cir. 2013)................................................................17

*Azzam v. Baptist Health Care Affiliates,*
    855 F. Supp. 2d 653 (W.D. KY 2012)......................................................13-14

*Bageris v. Brandon Twp..,*
    264 Mich. App. 156 (2004)……...............................................................17

*Benaugh v. Ohio Civil Rights Com'n,*
    278 Fed. Appx. 501 (6th Cir. 2008)..........................................................19

*Bryson v. Regis Corp.,*
    498 F.3d 561, 577 (6th Cir. 2007)............................................................22

*Cooper-Reid v. State of Michigan Third Judicial Circuit,*
    269254, 2007 WL 840275 (Mich. Ct. App. Mar. 20, 2007)....................18

*DeFlavis v. Lord & Taylor, Inc.,*
    223 Mich. App. 432, 443, 566 N.W.2d 661 (1997))...............................23

*Doren v. Battle Creek Health Sys.,*
    187 F.3d 595 (6th Cir. 1999)................................................................13-14

*Edwards v. Credit Acceptance Corp.,*
    2004 WL 1103773, 9 (Mich. App. 2004)................................................24

*EEOC v. United Parcel Serv., Inc.,*
    249 F.3d 557, 563 (6th Cir. 2001)............................................................19

*EEOC v. Prevo's Family Mkt., Inc.,*
    135 F.3d 1089, 1097 (6th Cir. 1998)........................................................16

*Gilday v. Mecosta Cty.,*
    124 F.3d 760, 762 (6th Cir. 1997)............................................................11

*Harrison v. Metropolitan Government of Nashville and David County, Tennessee,*
    80 F.3d 1107, 1119 (6th Cir. 1996).........................................................24

*Henderson v. Ardco, Inc.,*
    247 F.3d 645, 653 (6th Cir. 2001)............................................................16

*Hurtt v. Int'l Servs., Inc.,*
    627 Fed. Appx. 414, 422 (6th Cir. 2015)........................................................................21

*Joliet v. Pitoniak,*
    475 Mich. 30, 41, 715 N.W.2d 60, 68 (2006)...............................................................19

*Jones v. Mathai,*
    2010 WL 1286390, at \*4 (E.D. Mich. Mar. 31, 2010)..................................................18

*Keith v. Cty. Of Oakland,*
    703 F.3d 918, 929 (6th Cir. 2013)..............................................................................12

*Logan v. Denny's, Inc.,*
    259 F.3d 558, 572 (6th Cir. 2001)..............................................................................20

*McBride v. BIC Consumer Prod. Mfg. Co.,*
    583 F.3d 92, 102 (2d Cir. 2009)...................................................................................18

*McKelvey v. Secretary of U.S. Army,*
    450 Fed. Appx. 532 (6th Cir. 2011)............................................................................21

*McLemore v. Detroit Receiving Hosp. and University Medical Center,*
    196 Mich. App. 391, 493 N.W.2d 441 (1992).............................................................24

*Merlington v. Huron County Mental Health Servs.,*
    184871, 1996 WL 33348795 (Mich. Ct. App. Nov. 8, 1996).......................................18

*Reeder v. Cty. Of Wayne,*
    177 F. Supp. 3d 1059, 1081 (E.D. Mich. 2016)..........................................................21

*Riness v. Comm'r of Soc. Sec.,*
    No. 1:14-CV-1269, 2016 WL 270026, at \*3 (W.D. Mich. Jan. 22, 2016)....................15

*Ramanathan v. Wayne State University Bd. Of Governors,*
    2010 WL 1330290 (Mich. App. 2010).........................................................................23

*Talley v. Family Dollar Stores of Ohio, Inc.,*
    542 F.3d 1099, 1109 (6th Cir. 2008).....................................................................18, 20

*Tennant v. Comm'r of Soc. Sec.,*
    2016 WL 5799164, at \*5 (W.D. Mich. Oct. 5, 2016)...................................................15

*Vagts v. Perry Drug Stores,*
    204 Mich. App. 481, 487-88 (1994)............................................................................18

*West v. Tyson Foods, Inc.,*
    374 Fed. Appx. 624..................................................................................................21

*Williams v. Caterpillar Tractor Co.,*
    770 F.2d 47, 49 (6th Cir. 1985)...........................................................................19

**Rules**

Fed. R. Civ. P. 56(e)………………………………………………………...………15

**Statutes**

42 U.S.C. § 12102(2)(A)…………………………………………………...………10
42 U.S.C. § 12102(4)(C)…………………………………………………...….……13
42 U.S.C. § 12012(1)…………………………………………………………......…14
MCL § 37.1103…………………………………………………………………..…14
MCL § 37.1210(18)………………………………………………………..………17

**Other Authorities**

28 C.F.R. § Pt. 35, App. C……………………………………………….....*passim*

29 C.F.R. § 1630.2(j)(3)(v)………...……………………………………...………10

76 Fed. Reg. 16978, 16997, 2011 WL 1060575 (Mar. 25, 2011)………………….………11

EEOC Enforcement Guidance on the Americans with Disabilities Act and
    Psychiatric Disabilities…………………………………………………….………11

EEOC Directive No. 915.002, Enforcement Guidance: Reasonable Accommodations
    and Undue Hardship under the Americans with Disabilities Act, Q & A
    Answer #3 (October 17, 2002), available at
    https://www.eeoc.gov/policy/docs/accommodations .html@N_22_.....................................12

## STATEMENT OF QUESTIONS PRESENTED

1. Is there evidence from which a jury could find or reasonably infer that Plaintiff was denied accommodation of her disability?

   Plaintiff's answer: Yes

   Defendants' answer: No

2. Is there evidence from which a jury could find or reasonably infer that Plaintiff was discriminated against because she was "disabled" within the meaning of Federal or State law?

   Plaintiff's answer: Yes

   Defendants' answer: No

3. Can Defendants prevail in obtaining dismissal of claims they have not substantively disputed, including that Plaintiff was discriminated against because she was "regarded as disabled" within the meaning of Federal or State law or that she had a history or record of disability?

   Plaintiff's answer: No

   Defendants' answer: Yes

4. Is there evidence from which a jury could find or reasonably infer that Plaintiff was retaliated against, within the meaning of Federal or State law, because of protected activities such as seeking disability accommodation, complaining about non-accommodation, reporting a complaint to Michigan's Department of Civil Rights (MDCR), requesting an investigation into her denial of accommodations?

   Plaintiff's answer: Yes

   Defendants' answer: No

## <u>CONTROLLING AUTHORITY</u>

Federal Rule of Civil Procedure 56

This is case involves several different theories of recovery tied to Rita Morrissey's efforts to maintain her 17-year career as a nurse despite disabling conditions. Morrissey sought a very reasonable restriction of "only" working 12 hours per day. Defendants admit not only that they *could* accommodate this, but that they *did* so for years. However, Defendants decided (and announced on a tape recording attached) that assessing folks with asserted disabilities individually and accommodating them as needed was too complicated. Anyone with any request for disability accommodation no matter how "justified" would now simply be denied any and all work. No nuance or judgment applied; there was "no gray area" according to emails of senior management. Plaintiff was therefore not accommodated. She attempted to escalate complaints and was misled, blown off and told to quit if she did not like it. As her complaints became more frequent, retaliation began. Indeed, she was ordered to work beyond her restrictions, while others were allowed shorter hours to address child care needs or educational pursuits. Moreover, she was ordered to work beyond her limits when no one was actually needed, *and* contrary to Defendants' policies for assigning shifts. Defendants wanted Morrissey gone, and that is why they failed to investigate (again, admittedly against their policies) as she repeatedly raised complaints, verbally and in writing. Defendants flagrantly violated the ADA and PWDCRA applying the very stereotypes and biases the Acts were meant to address; this case is egregious and must go to a jury.

## COUNTER-STATEMENT OF MATERIAL FACTS

Rita Morrissey is a licensed practical nurse who worked for Defendants for more than 17 years. Her performance reviews were all "excellent" or "better than expected." P. Ex. B, Review Excerpts. Supervisors praised her competence, care and commitment, noting: "hard worker," "very thorough," "cares about the residents," "good knowledge base," and "gives great care." *Id*. Defendants admit her performance was always satisfactory. Answer, ECF No. 12, PageID.44 at ¶10.

**I.        Defendants Implement an Illegal Blanket Rule of Rejecting All Accommodations**

In February 2012, Defendants announced that disability accommodation requests would from

then on only be accepted if they resulted from a workplace injury. Jt. Ex. 1, Morrissey Tr. 69-71. At

a staff meeting with Plaintiff and other nurses, then-Director of Nursing Andrea Mangold announced:

> *In the past, if someone has had a disability or a doctor's slip of any kind, we really tried to work with our employees with their restrictions. And it's gotten to the point where we can't do that anymore ... Because I've tried to be a really nice guy and I've tried to really work with folks and I've gotten into trouble with doing that ….*
>
> *For those of you who I have been working with in the past on your restrictions . . . you have a week to see your physician, discuss this with him or her, and discuss what you can do 'cause ...* **if it's a not a work-related injury, I'm unable to accommodate** *….*
>
> **I have worked with you guys in the past, have worked with your limitations and disabilities, it's gotten me in a lot of trouble** *... I'm so sorry because I'm unable to do that anymore ….*

P. Ex. C, Audio Recording.

At Mot. 13, Defendants try to explain this away and even go so far as to claim that Plaintiff

has "never produced any evidence" that they had a policy of denying accommodations. That is a

surprising assertion. Managers reiterated *exactly* that policy, explicitly in writing, from 2012 to 2016.

> ***Administrator Erin Tuttle***: "*Laurel policy is that we Do Not provide restrictions for anyone unless the restrictions are related to a work related injury.*" Jt. Ex. 9, 8/26/15 Tuttle email (capitalization original).
>
> ***On-site disability coordinator Hal Nottingham***[1]: The "general practice throughout the corp." was, "*If you have a restriction like that, then you cannot work at the Laurels. We are not firing you, but you are off until you can come back with a doctor's note saying that you are able to work without restriction.*" Jt. Ex. 6, Nottingham Tr. 28-29; P. Ex. D, Text.
>
> ***Corporate employee Gregg Ferguson***: "*It is our policy at this time that light duty is only offered to employees that are injured on the job.*" P. Ex. E, Email.
>
> ***Nurse Julie Kittle:*** Defendants "*would no longer take restrictions. I recall [then Administrator] Curtis Covert telling us this information. Letters or notes were placed*

---

[1] Defendants admitted Nottingham's role in administering the ADA in discovery answers. P. Ex. X, Defendants' Ans. to First Set of Interrogs. Answer 6b. p. 4.

*inside paycheck envelopes to inform staff that no restrictions would be accepted."* P. Ex. F, Kittle Aff., ¶¶6-7.

**Aide Amanda Morrissey:** *"staff members were told in a meeting that they had to get off of medical restrictions if they wanted to keep their jobs."* P. Ex. G, 10/12/17 A. Morrissey Aff., *¶¶4-5.*

**Nurse Aide Corrine Bender**: *"[N]o one could have work restrictions. Many people talked about that being the policy, including managers and supervisors. I had an 8-hour work restriction for a bad back. When I submitted my restriction, it was given back to me, and I was told that I did not have a job there until I got the restriction lifted."* P. Ex. H, Bender Aff., ¶¶4-6.

**Nurse Marci Farmer**: *"The policy as I understood it was that if an employee had a restriction that was non-work related, the employee had to get the work restrictions lifted by their doctor(s)."* P. Ex. I, Farmer Aff., ¶5.

A handbook reciting that Defendants would entertain accommodation requests was understood to be window-dressing; for example, Nottingham testified, "any employer is going to put that in there. Otherwise they are going to get sued out the wazoo." Jt. Ex. 6, Nottingham Tr. 33. Refusing accommodations of any kind was the actual "***blanket policy***," that was applied "***across the board***," and for which there was "***no gray area***." Jt. Ex. 6, Nottingham Tr. 39:17-19; Jt. Ex. 5, Hibbard Tr. 53:14-25; Jt. Ex. 9, 8/26/15 Tuttle Email. The concept that anyone would consider accommodation requests individually was compared to opening "Pandora's box". *Id.*; Jt. Ex. 6, Nottingham Tr. 52:23-25. So, while they grasped that a blanket "no" would affect nurses who had a "really justified disability and I want to work with you," it was announced it was just too hard to assess needs individually.  P. Ex. C, Recording at 40:23-40:44.

## II.    Plaintiff's Disabilities Necessitate a Medical 12-Hour Work Restriction

Plaintiff suffers multiple disabilities, including scoliosis, bulging discs/degenerative disc disease, Ehlers-Danlos syndrome and Buschke-Ollendorff syndrome. These conditions caused (and continue to cause) Plaintiff severe pain and impacted her day-to-day functionality (although, as evidenced by her consistently solid performance evaluations, it did not affect her ability to perform

3

her job). Plaintiff suffered constant muscle and joint pain which caused twitches in her legs, sometimes taking a couple of days to return to normalcy. Jt. Ex. 1, Morrissey Tr. 78-82. Walking and standing caused Plaintiff shooting pain and numbness. *Id.* Climbing stairs triggers pain, and Plaintiff's ability to bend over is limited. *Id.* Symptoms can be so severe that Plaintiff has trouble even putting her underwear on. Her limitations affect other daily functions, such as sleep, driving and outside activities that she once enjoyed, like jogging. *Id.* at 79:24, 173:3-174:8. They also necessitated the use of medications, including Cymbalta, Ultram, Norco and Tylenol-3. *Id.* at 127:3, 134:1-13.

Defendants claim that Plaintiff's condition is evinced in this matter solely by her own subjective commentary, but her testimony is evidence. Moreover, her daughter has testified as to her conditions.  P. Ex. Q, 2/28/18 A. Morrissey Aff.  In addition, she has adduced medical evidence disclosing the somatic source of her limitations. P. Ex. O, *e.g.,* p. 3 (ordered to wear back brace in 2011), p. 4 (in 2012 noting disc desiccation from MRI), p. 5 (as of 2012 "Severe T11-L5 degenerative disc disease"), p. 9 (as of 2015 "Pt lacks cervical ROM [range of motion], strength, joint mobility…reduced posture"), p. 12 (2015 "abnormal" testing, "evidence of advanced L4-5, L5-S1 radiculopathy with chronic features"), p. 13 (noting as of 2017 "degenerative change"), p. 8 (reflecting moderate to severe degenerative disc disease ("DDD") at various points along spine); (reflecting she suffers "DDD, bulging discs" and that as a result, "cervical spine C4 is hypomobile…C5 is hypomobile…C6 is hypomobile" she exhibits "decreased ROM"), p. 7 ("gait abnormal"). Contrary to Defendants' uncited and baseless claim that Morrissey's conditions are temporary or passing, these records disclose a chronic and degenerative condition existent for years, and continuing to the present.

## III.    Defendants Learn of Morrissey's Disability

In early 2012, Plaintiff's physician restricted Plaintiff from working more than 12 hours a day *indefinitely*. *See* D. Ex. B, Shipe Note. Defendants had this note and knew of it during Morrissey's

employment.  *See* fn. 2, *infra*. Nevertheless, Defendants focus on additional nurse practitioner notes from different medical offices also placing a restriction until the next appointment. Notably, there is no foundation that (a) any of Plaintiff's bosses knew of those notes before her separation, (b) regarded Plaintiff's **doctor's** indefinite note as superseded, or (c) ever engaged with Plaintiff to ask what her status was (such as whether later appointments occurred).

This latter point especially is important since Plaintiff discussed her need for accommodation verbally with Administrator Curtis Covert, Hal Nottingham, Director of Nursing Andrea Mangold, Corporate Nurse Sue Sissco, Director of Nursing Jeanine Hayes, direct boss Kristy Hibbard, and Regional Director Jeff Shepard. *E.g.,* Jt. Ex. 1, Morrissey Tr. 83:20-84:3, 145:24-25. Moreover, Defendants' emphasis on the nurse practitioner notes conveniently ignores how Covert, Mangold, Nottingham, Hayes and others badgered Plaintiff about her restriction, telling her that she had to have it lifted and threatening to terminate her if she did not. *Id.* at 89:1-90:8, 93:1-2; P. Ex. G, A. Morrissey Aff., ¶6 (if she did not like it, she could leave, and was "a dime a dozen"); P. Ex. F, Kittle Aff., ¶8.

In 2015, Plaintiff required surgery for carpal tunnel syndrome. Jt. Ex. 1, Morrissey Tr. 95:11-14. To plan her return after surgery, Plaintiff spoke with scheduler, Terri Short-Peebles, Director of Nursing, Jeannine Hayes, and ADA coordinator Nottingham. *Id.* 97:4-25. The parties discussed Plaintiff returning to a limited desk job that would involve only paperwork, not nursing. *Id*. Peebles responded, "Oh, she can't do that," and pointed to a posted memo from Administrator Erin Tuttle stating that Defendants would not consider or allow restrictions for any positions. *Id*.

Defendants make much of a note Plaintiff brought in clearing her restrictions due to surgery, but they ignore a key fact. Plaintiff verbally explained in the meeting with Hayes, Peebles and Nottingham that the surgeon did ***not*** lift the 12-hour work restriction for her back, and that her primary treater's note still remained in her file. *Id*. Peebles responded that Defendants would "probably not"

accept that. *Id*. Plaintiff did not refuse to come back to work in the face of the policy/stereotype that folks with limitations could not even do paperwork. Rather, she returned to nursing duties on or about September 29, 2015. *Id*. 96:6-24. Again, no resolution about her accommodation was reached.

## IV.    The Laurels Mandates Plaintiff to Work More Than 12 Hours

Pressure to work beyond her accommodation increased upon Morrissey's return; indeed, bosses started talking about making 12-hour shifts standard. Plaintiff thus embarked on a multi-faceted, extensive effort to work through Defendants' announced policy that, in case of any overage, they would not accommodate her. While Defendants' motion characterizes her as "abandoning" her job abruptly, the fact is Plaintiff went through months of efforts after those already listed above, to try to work with Defendants.

The list begins with two attempts at resolution with Hayes in around October 2015. Both times, Hayes held firm that Defendants would not consider accommodating Plaintiff by keeping her work at or below 12 hours. *Id.* at 124-125. In fact, Hayes told Morrissey if she wanted to work within her restrictions, Morrissey would have to lose her full-time hours and benefits, going to "casual" status.  *Id.; see also id.* at 69.  Moreover, Hayes threatened that Morrissey would not receive a regular schedule of hours if she did so, which was a difference in treatment compared to other nurses who were assigned regular schedules on "casual" status. *Id.*

In or around December 2015, Defendants carried out the planned change from regular shifts of 8 hours to regular 12-hour shifts, as their motion recites. This modification presented the anticipated immediate conflict with Plaintiff's accommodation request, because Defendants "mandated" nurses to work beyond their assigned shifts to cover for late arrivals, sick calls etc. Defendants claim at Mot. 4 and 9 that Morrissey "voluntarily elected" the twelve-hour shift, with no citation. The truth is, she requested assignment to the C wing of the hospital that was not going to 12-hour-standard shifts.  *Id.*

68-69. However, Hayes refused to allow her to choose that shift. *Id.*

Nevertheless, Plaintiff did not leave the job. Indeed, in violation of her restriction, Plaintiff began to work to a limited degree more than 12 hours, as seen at Mot. 5.  This occurred at least four times between December 6 and January 30, 2016.  *Id.*

At the same time, to continue to try to find a resolution, Morrissey complained to her direct boss, Unit Manager Kristy Hibbard, that she was working against her medical restrictions. Jt. Ex. 5, Hibbard Tr. 43:24-44:17. Hibbard in turn directed Plaintiff to talk to Regional Operations Manager Jeff Shepard. *Id.* 44:18-25, 64:19-65:2. Plaintiff did so, complaining directly about being held over in violation of her 12-hour restriction, contrary to Defendants' claims at Mot. 15 that she only complained about staffing. Jt. Ex. 1, Morrissey Tr. 106:11-107:13. Shepard told Plaintiff that he would "look into it" and get back to her. Jt. Ex. 4, Shepard Tr. 48:20-23. However, Shepard admits, "I just dismissed it." *Id.* 48:24-49:1, 49:4-13. He assumed Plaintiff was just a "habitual complainer," though admittedly he did not know if there was genuine and valid concern—nor did he bother to find out. *Id.* 49:14-16.

Plaintiff did not quit after being mandated, then misled and dismissed this way; she continued working. On January 31, 2016, Defendants again mandated Plaintiff to work more than 12 hours. Jt. Ex. 1, Morrissey Tr. 105:11-13. Notably, Defendants admit at Mot. 4 that they "always" attempt to find volunteers before mandating employees. Yet, with Morrissey they did not, as Hibbard admitted. Jt. Ex. 5, Hibbard Tr. 88-95.  No one has a non-retaliatory/discriminatory explanation for that.  In response, Plaintiff called Hibbard. Jt. Ex. 1, Morrissey Tr. 114:21-115:2. Hibbard confirmed that Plaintiff was mandated for 16 hours. Contrary to Defendants' many representations to this Court that Morrissey only vaguely raised workplace staffing issues, Plaintiff told Hibbard point blank that she needed accommodation, she had a doctor's note, she had consulted with MDCR and the mandation

7

violated her ADA rights. *Id.* 115:10-116:7. Hibbard responded that she had "no control over that." *Id.*

      **Still** Plaintiff did not just quit. In fact, she worked as ordered that day, once again violating her doctor's orders and working past 12 hours, as is undisputed. This work worsened Plaintiff's condition. She visited her doctor, and now needed new medications for the pain. *Id.* at 126-127.

      Nevertheless, Plaintiff did not quit trying. She next called Director of Associate Development Brent Tippie, both time leaving messages that she had some complaints. Jt. Ex. 1, Morrissey Tr. 46:4-7. Tippie did not respond to her; they never spoke. *Id.*

## V.    Plaintiff Is Mandated Again and Submits Written Complaint of ADA Violations

      On February 4, 2016, in violation of both her restrictions *and* Defendants' shift assignment selection policy, Plaintiff was again mandated to work beyond 12 hours. *Id.* 120:9-121:8. Per Defendants' standard policy, nurses who were most recently mandated were the last to be mandated the next time. P. Ex. A, Massey Aff., ¶5. In case of a tie, selection was alphabetical. P. Ex. I, Farmer Aff., ¶11; Jt. Ex. 1, Morrissey Tr. 103:4-104:1. Because she had just been mandated January 31, Plaintiff was not next in line on February 4. Jt. Ex. 1, Morrissey Tr. 103-104. Co-worker Marci Farmer was due instead, as Farmer testified. *Id.;* P. Ex. I, Farmer Aff., ¶11. Defendants have never offered any non-retaliatory explanation for Morrissey being mandated out of turn this way.

      Instead, Defendants claim Plaintiff walked off her job based only on a *possibility* of being mandated. That is simply not correct. Upon learning of the mandate, Plaintiff called her boss, Hibbard, and once again said this was a violation of her accommodation. Jt. Ex. 5, Hibbard Tr. 77:2-11. Hibbard told Plaintiff that she had to stay. *Id.* 77:13-16, 78:21-22. Plaintiff escalated the issue to Hibbard's boss, Hayes. Hayes "did not" say Defendants were calling others to try to fill the slot, nor that it was a "possibility" Morrissey might be mandated. Jt. Ex. 1, Morrissey Tr. 129, 121:14-18.  Rather, "[s]he told me that I had to stay and do 16 hours." *Id.* It was only then that Plaintiff left the worksite.

8

While Defendants' motion implies that mandating is only done for resident safety, Defendants did not mandate anyone else on February 4 after Morrissey left. *See* Mot. 16. The supposed need to mandate evaporated once Morrissey left.

## VI. Defendants Depart from Prior Practice of Returning Nurses to Work and Depart from their Policy of Investigating ADA Complaints

Other nurses had left their shifts early like Plaintiff did on February 4, and they returned to work. J. Ex. 1, Morrissey Tr. 112. Therefore, the next day, February 5, Plaintiff sent a detailed letter to Tippie and Shepard, stating that she did not resign, but again reporting that her ADA rights were being violated, that she was being retaliated against. She asked for a response. Jt. Ex. 8, Complaint; Jt. Ex. 11. Contrary to Defendants' claims that Morrissey only complained about staffing, but never disability issues, the letter unmistakably states that her ADA rights were being *violated*.

Defendants' policies required Shepard to conduct an in-depth investigation into Morrissey's complaint. Jt. Ex. 4, Shepard Tr. 57-58, 65:19-66:7, 68:24-69:3. Yet, Shepard did not call Morrissey or otherwise try to investigate, let alone offer return to work. *Id.* 57-58; 68-69; *see also* Jt. Ex. 3, Tuttle Tr. 40:4-41:6. Defendants would go on to lie to the MDCR about this. They represented that Shepard tried to contact Plaintiff to investigate, but that Plaintiff never returned his call. However, Shepard admitted the truth: he did not try to contact Plaintiff. *Compare* P. Ex. W p. 4, Defendants' Discovery Answer # 17 *with* Jt. Ex. 4, Shepard Tr. 63:5-14.

## VII. Defendants Excused Nurses from Mandation for Non-Disability Reasons

While Morrissey was refused exemption from mandates, non-disabled employees were excused from mandates to attend sporting events, to care for sick family members and to attend college. Jt. Ex. 1, Morrissey Tr. 109:24-111:20. No one has explained why non-disabled workers were allowed leeway, but Morrissey was not.

9

**LEGAL ARGUMENT**

**I.    Plaintiff Was Disabled**

A disability is an impairment that substantially limits a major life activity.  In 2008 the ADA was amended to ensure that the question of whether an individual has a disability will "not demand extensive analysis," and that the definition "shall be construed broadly in favor of expansive coverage…." P. Ex. L, 28 C.F.R. § Pt. 35, App. C (extensively explaining ADA amendments). This Plaintiff is substantially limited the major life functions of "walk[ing], stand[ing], bend[ing], and lift[ing] repetitively." Am. Compl., Dkt. 8, PageID.24, ¶ 9.  Defendants do not dispute that these are "major life activities."  *See also* 42 U.S.C. § 12102(2)(A).

Rather, they argue in separate brief sections relating to the ADA and PWDCRA that (1) Plaintiff has only "self-serving" testimony to evince the extent of her limitations, (2) any limitations were temporary and thus do not qualify, (3) her afflictions were "relatively minor and widely shared" or "common complaints," she only had "more pain" as she got tired like anyone would, (4) because she could work 12 hours, she was not substantially limited *in the life activity of working*, (5) her mitigating factory work shows she was not disabled *in the life activity of working* (6) to show a substantial limitation *in working* she would need to show exclusion from a wide range of jobs and does not do so.  Plaintiff will respond item by item.

As to item (1) concerning Plaintiff's proofs, Defendants lack any citation and are wrong that additional proofs are necessary. Assessment of a plaintiff's disability will "usually not require scientific, medical, or statistical analysis." 29 C.F.R. § 1630.2(j)(3)(v).  "[O]ther types of evidence that are less onerous to collect, such as statements or affidavits of affected individuals…should, in most cases, be considered adequate to establish that an impairment is substantially limiting."  P. Ex. L, 28 C.F.R. § Pt. 35, App. C at 12.  Congress amended the ADA in 2008 in response to overly

10

demanding requirements as to proofs, to lessen the need for "costly experts to address 'disability' and streamline the issues requiring judicial attention." 76 Fed. Reg. 16978, 16997, 2011 WL 1060575 (Mar. 25, 2011); *see also EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities* ("Credible testimony from the individual with a disability and his/her family members, friends, or coworkers may suffice.").

Moreover, the factual premise of Defendants' argument is also wrong, since Plaintiff does ***not*** only rely on her account of her condition. Rather, she cites lay testimony, P. Ex. Q, 2/28/18 A. Morrissey Aff., *and* medical records reflecting a somatic source of her injury and diagnosis. P. Ex. O. This differentiates the case from those where a plaintiff's sole proof of disability is a subjective account of symptoms.

Exhibits O and Q answer arguments (2) and (3) above, as well. Defendants simply claim without citation that Plaintiff's condition was temporary or too common to qualify for protection. However, medical records evince chronic and ongoing disease over a series of years and severe practical impacts, and ***there is no counter-evidence in this record***. At worst for Plaintiff this means there is a triable issue here. *E.g., Gilday v. Mecosta Cty.*, 124 F.3d 760, 762 (6th Cir. 1997) (reversing trial court for finding plaintiff was not "disabled" as a matter of law, noting the matter was a question for the jury). [2] At Mot. 19-20, Defendants make the related claim that Plaintiff was not substantially

---

[2] While Defendants imply Morrissey's carpal tunnel surgeon's release to work is medical evidence relative to Plaintiff's back injury being resolved, there is no evidence the surgeon assessed Plaintiff's spine. Even if the carpal tunnel surgeon's note did imply a "temporary" condition which had been resolved, Plaintiff's Exhibits O and Q refute that. Even more fundamentally, this surgeon's note is irrelevant when assessing the definition of a disability. The existence of a standing request for accommodation is simply not required for a person to meet the definition. In fact, for those who *do* request accommodations, they need not do so in writing at all. P. Ex. N, EEOC Directive No. 915.002, Enforcement Guidance: Reasonable Accommodations and Undue Hardship under the Americans with Disabilities Act, Q & A Answer #3 (October 17, 2002), available at https:// www.eeoc.gov/policy/docs/accommodation .html#N_22. Accordingly, even if the status of a request for accommodation did reflect on whether a person genuinely was "disabled," Morrissey's many verbal requests for accommodation from October 2015-February 2106 (after the surgeon's note) control.

11

limited, it was just that her "pain increases after prolonged periods" and her abilities depended on how crazy the day was. As to the pain issue, Defendants offer no citation to support their argument and again they misunderstand the law. This Court is required to consider pain in assessing disability**.** P. Ex. L, 28 C.F.R. § Pt. 35, App. C 20-21 (a person can be substantially limited because their "impairment causes pain or fatigue that most people would not experience when performing that major life activity"). Nothing in this record allows this Court to just assume or infer that Plaintiff's pain was the same or less than others. At best, that is a fact question. As to the level of activity in her day, Plaintiff testified that she had to take rests and engage in therapeutic stretches to go on. When she could not do that, her condition was worse. But that does not mean she was not disabled on days she *could* ameliorate the problem. On the contrary, "whether [the disability's] effects can be mitigated," and "any ameliorative effects of mitigating measures that are employed" may "not be considered in determining if the impairment is substantially limiting." *Id.* at 14-15.

Rather than attack the case as pled, Defendants' remaining arguments (4), (5) and (6) each aim to show that Plaintiff was not substantially limited in the major life activity *of working*. However, Morrissey does not claim that. She does not dispute, for example, that a person with a 12-hours-or-less restriction can work many types of jobs. Rather, she pled she is substantially limited in walking, standing, bending, and lifting repetitively.

---

Nor can Defendants claim to be confused about why Plaintiff would provide a note sending her back to work in September 2015, if she really were disabled. First, her bosses did not even see this surgeon's note they center so many of their arguments on until this litigation began. Jt. Ex. 2, Hayes Tr. 65. The post-carpal-tunnel-surgery note therefore had absolutely nothing to do with how they treated her. The note they did know of and see at the time was the 12-hour restriction note. *Id.* 51. Moreover, even as she agreed to bring in the only note that would have returned her to work after surgery, Morrissey reiterated to her superiors that her back-related disability and need for restriction remained, over and over again, as cited above. It is undisputed Defendants never undertook *any* steps in fulfillment of the *mandatory* interactive process to engage with Morrissey about this. *See Keith v. Cty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) (explaining this duty). As such, they cannot complain that they were confused.

The difference is critical here, and Defendants attempt to really muddle it.  The key legal point is that an "impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment." 42 U.S.C. § 12102(4)(C); *see also* P. Ex. L, 28 C.F.R. § Pt. 35, App. C at 9. For example, while a person substantially limited in standing might not be substantially limited in working (after all there are lots of desk jobs), she would still qualify as "disabled." This is true even if she could not show that her limitation ruled out working, because standing is a sufficient major life activity. *See id.*

Defendants aim to focus this Court on the major life activity of working, rather than the more narrow life activities Plaintiff is citing, because showing a person is substantially restricted from working is just harder to do. After all, there are many kinds of work. Furthermore, there are unfavorable restricted-in-work cases that seem, at first glance, relevant here. For example, at Mot. 8-9 Defendants cite cases such as *Azzam v. Baptist Health Care Affiliates* and *Doren v. Battle Creek Health Sys.*—cases supposedly establishing that when a nurse can work a full day but cannot work extended hours she is by definition not covered by the ADA.

There are several independent, serious problems with Defendants' citations. First, Defendants rely on superseded law.[3] The ADA was amended in 2008 and regulations were issued in 2011 to loosen the criteria for finding someone disabled, so these cases cannot be relied upon. "[P]rior to the adoption of the ADA Amendments Act, courts were using too high a standard" for deciding who is "substantially limited'" the Act reflects "Congress's rejection of the demanding standards of proof imposed," so that "this assessment [today] requires a lower degree of functional limitation" than

---

[3] For example, in *Azzam* now-controlling regulations did "not apply retroactively."  *Doren* arose even earlier, and did not consider the ADA as currently amended at all, including the statute and the regulations. *Lown* cited at Mot. 18 explains Michigan Courts follow EEOC regulations for the PWDCRA, but it relied on and cited superseded regulations, and thus the case is outdated by its own terms. Of Defendants' citations only *Garlock* arose post-ADA amendments, and in holding that a person who could work full time was not substantially limited in his ability to work that court cited *only* pre-amendment cases.

13

before. P. Ex. L, 28 C.F.R. § Pt. 35, App. C at 11.

Moreover, Defendants' old authorities each speak to the activity *of working*, which is not at issue here. To show "substantial" impairment in working, these pre-2008 cases held that plaintiff must show she cannot complete as many kinds of work as the average person. However, that point does not aid this Court, because *this* Plaintiff does not claim that her disability prevented her from working with accommodation. She is not required to show what Azzam, Lown, Doren, etc., were required to show, because this Plaintiff pleads different limitations. Defendants' restricted-in-work cases are just not on point. Meanwhile, Defendants' motion in no way claims that Plaintiff has failed to show she is substantially impaired in the life activities at issue here. That is dispositive. Movants' bear the burden to show there are no triable facts here.

## II.    Defendants' Arguments Do Not Substantively Address "Regarded As" or "Record of Disability" Theories & This Means Defendants Do Not Carry their Burden as Movants to Secure Judgment

There are three ways to qualify for coverage under the ADA and PWDCRA. *See* 42 U.S.C. 12012(1) (disjunctive list of three qualifiers), MCL § 37.1103. Plaintiff has pled all three apply, *see* Am. Comp., Dkt 8, Pg. ID 23-24, 32 ¶¶1, 9, 65. Defendants' motion does not substantively address the latter two—namely, that Plaintiff was "regarded as" disabled and/or had a record of disability. Nor are Defendants' existing arguments applicable to these two theories for recovery. For example, as to a "regarded as" disabled theory, "[t]he concepts of 'major life activities' and 'substantial limitation' simply are not relevant...." P. Ex. L, 28 C.F.R. § Pt. 35, App. C at 28 (internal punctuation omitted); *id.* (under this prong there is no functional test of abilities at all). Yet those are the only aspects of the "disability" definition Defendants debate.

Non-movant is not required to brainstorm and defeat inchoate or as-yet-unstated arguments, and this Court has held that it "will not speculate on possible arguments" for the parties, either. *E.g.,*

14

*Riness v. Comm'r of Soc. Sec.*, No. 1:14-CV-1269, 2016 WL 270026, at *3 (W.D. Mich. Jan. 22, 2016), P. Ex. R. This commitment, mandated by Fed. R. Civ. Proc. 56(e), makes this Court's job here simple: Defendants cannot prevail where they do not even challenge independently sufficient theories of recovery. Moreover, per this Court, perfunctory arguments or "[a]rguments raised for the first time in a reply brief are waived." *Tennant v. Comm'r of Soc. Sec.*, 2016 WL 5799164, at *5 (W.D. Mich. Oct. 5, 2016), P. Ex. S.

In any case, Plaintiff has evidence to support her unchallenged theories.  First, it is beyond dispute that Plaintiff had a history or record of disability. Defendants admitted knowledge of Morrissey's requested accommodation in the Answer, Dkt 14 at PageID.45. This alone should close the question whether the ADA applies here.

In order to be "regarded as disabled," the plaintiff must only show that she has some "[p]hysical or mental impairment" which means: "[a]ny physiological disorder or condition…such as….musculoskeletal…orthopedic…." 29 C.F.R. § 1630.2(h)(1). A plaintiff is *not* required to show that the impairment limits performance of a major life activity or was perceived to do so. P. Ex. L, 28 C.F.R. § Pt. 35, App. C at 27-28. Evidence cited above reflects the following: Plaintiff gave notice of her back problem and need for accommodation to a lengthy list of superiors; Hibbard admits Morrissey raised her need for accommodation in a telephone call on January 31, 2015; others heard the facility Administrator chiding Morrissey for seeking accommodations; and Morrissey was told she must have her restrictions lifted. All this reflects notice of Morrissey's impairment. In addition, Defendants represented to MDCR that they "accommodated her," P. Ex. J, Position Statement pp. 5-6; P. Ex. W, Discovery Answer #7 p. 7, and they say the same here. Mot. 12. These facts allow the jury to infer knowledge of Plaintiff's impairment.

Moreover, there is ample evidence of Defendants stereotyping individuals seeking any sort of

15

restriction as categorically, totally disabled. This gets to the very purpose of the "regarded" as prong of the ADA—which is to "prohibit employers from making adverse employment decisions based on stereotypes and generalizations...." *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (6th Cir. 1998). The evidence above demonstrates a "blanket" corporate policy that anyone seeking any accommodation whatsoever is totally unemployable—and there was "no gray area." A jury could readily infer this applied to Plaintiff since it was a "corporate wide" rule. Furthermore, the stereotype was *not* only limited to excluding folks from nursing, but from ***all*** work of any kind. *See* Jt. Ex. 1, Morrissey Tr. 97 (recounting being told that if she had any request for any restriction Defendants would deny her even desk jobs or paperwork). Where employers demand perfect health to work and the rule is applied to even "mildly impaired persons to exclude them from a broad class of jobs, [the employer] may be treating them as disabled even if they are not, thereby qualifying them for protection under the ADA and parallel statutes...." *Henderson v. Ardco, Inc.*, 247 F.3d 645, 653 (6th Cir. 2001). The evidence in this case is overwhelming that Defendants "regarded" anyone seeking any restriction as useless and too much bother with; whether they could work or not or needed a major accommodation or minor one, they were ejected, period. This is paradigmatic "regarded as" discrimination. P. Exh. L, 28 C.F.R. § Pt. 35, App. C at 27 (this prong is aimed at those who are not necessarily disabled but "were subject to adverse decisions...based upon unfounded concerns, mistaken beliefs, fears, myths or prejudices....").

## III.    Defendants Failed to Accommodate Morrissey

Because Morrissey was disabled, she was entitled to accommodation if her request was reasonable. Defendants do not dispute this very fundamental point of law, nor have they challenged her request as unreasonable. *See also* fn. 4, *infra*.  Since they refused consider or implement her restriction, her failure-to-accommodate claims are colorable.

16

At Mot. 24 Defendants urge the Court to dismiss the PWDCRA failure-to-accommodate claim because, unlike federal law, MCL § 37.1210(18) requires a written request for accommodation. Since Morrissey turned in Def. Ex. B, which clearly is a written request, they argue that the note is insufficient because it did not provide notice of the cause of the restriction, citing *Bageris v. Brandon Twp.,* 264 Mich. App. 156 (2004). However, that case only requires that the notice give the "employer…a certain level of awareness regarding a plaintiff's situation …[it] must allow defendant the opportunity to assess the accommodation request." *Id.* at 165. Here, Plaintiff's note states: "back pain" as the cause of the restriction. Def. Ex. B. By contrast, the plaintiff in *Bageris* asked for a reader to take a promotional exam with no explanation at all. **Notably, Defendants actually understood Morrissey's note as a request for accommodation and admit they accommodated Morrissey because of it for years,** as cited above. Nothing they cite permits an employer on *actual* notice to later pretend it lacked notice under MCL § 37.1210(18).

Even if the Court were to disagree, this argument solely affects Morrissey's state failure-to-accommodate claim. Federal law does not require a note. *See* fn. 2 (citing EEOC guidance).

## IV.    Plaintiff Was Subjected to Adverse Actions

Both Plaintiffs' discrimination and retaliation theories for recovery require showing an adverse action. At Mot. 12-14 and at 21-22 Defendants argue that there was none. However, they again do so with no legal analysis. For example, what constitutes "adverse" action is a "low bar." *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013).  While "petty slights or minor annoyances" cannot qualify, the action must simply be enough to dissuade a reasonable person from engaging in the protected activity. *Id.*  Defendants never explain this.

Denying a reasonable[4] accommodation and eschewing the duty to engage the Plaintiff in an interactive dialogue about her need for accommodation are adverse actions that give rise to an inference of discrimination. *E.g., Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1109 (6th Cir. 2008); *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 102 (2d Cir. 2009). Defendants do not mention these adverse actions.

Defendants also ignore the harassment identified above, such as the chiding and threats to fire Plaintiff by Covert, comments that the jobs of those seeking accommodation were in jeopardy by Nottingham, and Hayes' suggestions that if Morrissey wanted to work within her accommodation, she could work part-time hourly, without benefits, as a "casual" worker. *See Jones v. Mathai*, 2010 WL 1286390, at *4 (E.D. Mich. Mar. 31, 2010), P. Ex. T (citing 6th Circuit law establishing that "whether an activity would pose a sufficient deterrent is seldom a question of law and should be determined by a jury unless it is truly inconsequential.").

Beyond this, Plaintiff was constructively discharged. "[C]onstructive discharge is a defense against the argument that no suit should lie in a specific case because the plaintiff left the job voluntarily." *Vagts v. Perry Drug Stores*, 204 Mich. App. 481, 487-88 (1994). It "is established where … a reasonable person in the employee's shoes would feel compelled to resign." *Id.* at 487 (internal citations omitted). "Where reasonable persons could reach different conclusions regarding whether these elements are established, the issue becomes a question of fact for the jury and not one properly decided by the trial court." *Id.*; *Cooper-Reid v. State of Michigan Third Judicial Circuit*, 269254, 2007 WL 840275 (Mich. Ct. App. Mar. 20, 2007) ("Whether constructive discharge has been established is generally a question of fact."), P. Ex. U; *Merlington v. Huron County Mental Health Svs., 184871*,

---

[4] Defendants do not dispute that a 12-hour work restriction is "reasonable" and have waived any argument to the contrary. *See also* Jt. Ex. 2, Hayes Tr. 27 (mandating was "rare" and "not standard"), 39 (there were 8-hour shifts available), Jt. Ex. 3, Tuttle Tr. 20-21 (stating that Defendants honored work-duration restrictions and would not need to mandate nurses to stay if such restrictions were requested).

1996 WL 33348795 (Mich. Ct. App. Nov. 8, 1996) ("Whether plaintiff's working conditions were intolerable and whether defendant acted intentionally are questions of fact for the jury."), P. Ex. V.

The Sixth Circuit has found a jury question on this issue in a wide host of circumstances. *See, e.g., Williams v. Caterpillar Tractor Co.*, 770 F.2d 47, 49 (6th Cir. 1985) (plaintiff could survive summary judgment upon showing she had been given new job duties that required more physical exertion, although another employee had accepted re-assignment to the same position without complaint); *Benaugh v. Ohio Civil Rights Com'n*, 278 Fed. Appx. 501 (6th Cir. 2008) (jury question arose where employee complained her office was too cold, although the defendant had offered her a warmer office, because there was mixed evidence about the genuineness of its offer).

Here, Defendants do not argue that the situation Morrissey faced fails to meet the standard for constructive discharge. They simply frame this as voluntary "job abandonment" and imply that such a situation is per se not actionable. *E.g.,* Mot. 12.  Since constructive discharge is clearly an adverse action and since Defendants do not explain why Plaintiff would fail to meet the standard, they have not shown entitlement to relief as is their burden, as movant. That is determinative.

However, if this Court wishes to dig deeper, Morrissey cites many facts above that must be considered in aggregate and in the light most favorable to her. *Joliet v. Pitoniak*, 475 Mich. 30, 41 (2006). First, Morrissey was told that if she wanted to be accommodated she could quit, she was a "dime a dozen," or she could take a "casual" part time status, without benefits or guaranteed hours. A jury could conclude that this uneven policy and Hobson's choice—forsake one's rights or else—were intolerable and foreseeably so. "[A]n employee's resignation is not truly voluntary when, as here, it has been encouraged by his employer as a purportedly necessary step in accommodating his disability." *E.E.O.C. v. United Parcel Serv., Inc.*, 249 F.3d 557, 563 (6th Cir. 2001).

In addition, Morrissey tried over and over to work beyond her restrictions and tried hard to

19

escalate her concerns to obtain redress. It is clear, Defendants' per se policy of non-accommodation was inflexible and corporate-wide. The bosses perceived the "blanket" rule would fall on some with a "really justified disability." And they knew the company had cynically recited ADA-compliant rules in the handbook only so they would not be "sued out the wazoo." Yet they regarded disabilities as a "Pandora's box." Meanwhile, as cited above, peers of Morrissey with non-disability excuses were exempted from mandation. *Cf. Logan v. Denny's, Inc.*, 259 F.3d 558, 572 (6th Cir. 2001) (comments and actions reflecting "invidious discrimination" may and did create a question of fact as to intolerable atmosphere).

Beyond this, Plaintiff's restriction was violated (a) repeatedly over a long period (at least seven instances are admitted) ***and*** (b) more extensively (i.e., progressively mandating to stay longer than ever before) ***and*** (c) more frequently over time. *See* Mot. 5 (chart). Furthermore, evidence here permits an inference of targeting Morrissey. Specifically, Morrissey was assigned *more* mandated shifts than was expected per policy, both because Defendants refused to seek volunteer fill-ins before mandating Morrissey as their motion says they "always" did do (January 31) and because they mandated Morrissey out of order (February 4). The reality that they did not even need a nurse mandated February 4 is established by the fact that, after Morrissey refused to stay, Defendants did not even bother to try anyone else.  Cites are above.

Consistent with this, Defendants demonstrated no intention to investigate or correct the matter. Morrissey's immediate boss never took any steps to address the matter; she even refused to go look in Morrissey's file for her doctor note and just passively claimed the situation was out of her control.  J. Ex. 5, Hibbard Tr. 61-65. *Cf. Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1109 (6th Cir. 2008) (similar facts allowed inference of constructive discharge in disability case).  Far from helping, the Director of Nursing conveyed she herself had gotten "in a lot of trouble" for trying

to accommodate disabled workers. P. Ex. C, Audio Recording of Staff Meeting at 40:13-40:23. Finally, Shepard outright misled Morrissey about being willing to investigate her concerns, only to dismiss her as a "complainer." He also ignored Morrissey's written complaint, though obliged to investigate it. *Cf. McKelvey v. Secretary of U.S. Army*, 450 Fed. Appx. 532 (6th Cir. 2011) (evidence that plaintiff had sought redress and been denied relief supported finding of constructive discharge); *West v. Tyson Foods, Inc.*, 374 Fed. Appx. 624 (lack of response to complaints supported constructive discharge). As a result, unlike others who had left shifts early or refused to be mandated, Morrissey thus never was extended the chance to return. This evidence amply established a jury question.

## V.    Defendants' Limited Attacks on PWDCRA and ADA Retaliation Claims Are Legally Incorrect and Insufficient to Grant Dismissal

Defendants correctly recite the four elements Plaintiff will need to show at trial to support her retaliation claims at Mot. 14 and 24. However, their challenge to these claims is quite limited. As set forth above, Plaintiff and this Court are not to brainstorm arguments. However, at Mot. 5, 15 and p. 25, Defendants do challenge the element requiring Plaintiff to show she engaged in protected activity. They argue she did not do so, but only complained about staffing levels.

First, Plaintiff does not dispute the straw man argument at Mot. 15 that simple complaints about "management decisions" (unrelated to disability) are without protection. However, the facts overwhelmingly show Morrissey engaged in numerous protected acts Defendants knew of.  First it is undisputed that Morrissey made multiple written and verbal requests for accommodation, *see, e.g.,* Def. Ex. B-D, Jt. Ex. 1, Morrissey Tr. 115, 97, 107. "[R]equests for accommodation are protected acts." *Hurtt v. Int'l Servs., Inc.*, 627 Fed.Appx. 414, 422 (6th Cir. 2015). This goes for both ADA and PWDCRA.  *See, e.g., Reeder v. Cty. of Wayne*, 177 F. Supp. 3d 1059, 1081 (E.D. Mich. 2016) (submitting note to be excused from overtime was protected under both statutes). Morrissey also told her direct boss that she had complained of Defendants' non-accommodation to MDCR, which is a

21

clearly protected act. Defendants' claim at Mot. 16 that they did not know this had occurred—another disputed fact.

Morrissey also explicitly said to her boss, "you're violating my rights under the ADA…you have to accommodate me."  Jt. Ex. 1, Morrissey Tr. 115. That is classic opposition to a violation of law. While Defendants argue Plaintiff never said this same sentence to Erin Tuttle, the Administrator, the person to complain to about lack of accommodation was the immediate supervisor per Hibbard. J. Ex. 2, Hayes Tr. 42-43 and P. Ex. J, Position Statement at 4. In addition, Morrissey made a written complaint invoking the ADA that mentioned lack of accommodation and retaliation asked for a response. J. Exh. 8.  Defendants try to get around this by noting the letter was turned in February 4 or 5, after Morrissey had left her shift early. Mot. 16. But Plaintiff has adduced specific evidence that others had been excused from mandation or had been returned to work after walking off the job—and that Defendants had a policy to follow up on her letter of complaint and did not do so. Defendants cannot explain why she was not treated the same.  In any case, she clearly engaged in protected acts.

Next, Defendants claim that Morrissey's state and federal retaliation claims fail "especially" because she was not "disabled" and "did not have any medical restrictions in place at the time" of her separation. Mot. 16, 25.  That is dead wrong.  Morrissey can prevail on a retaliation theory even if she were not disabled at all.  *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007) (collecting cases); Mich. Civ. JI 106.07 (listing elements of her claim).

Finally, at Mot. 16 and 25, Defendants attack the prong of this claim requiring Plaintiff to show an adverse action occurred. This argument is answered above; there is ample evidence of denial of accommodations, harassment and constructive discharge to give this question to the jury.

Plaintiff is not required to buttress the causation element of her claim, which Defendants do not challenge. As cited above, this Court deems arguments raised for the first time in a reply to be

waived. Plaintiff urges it to do so here. Solely in an abundance of caution, it is worth noting the evidence that Defendants were motivated by Plaintiff's vocal requests for disability rights.  This begins with a fact Defendants admit: that they did not actually force another nurse to stay for the last shift Plaintiff worked. *See* Mot. 16. The Defendants' inference is that this meant Morrissey would not have been compelled to stay in violation of her restriction, either. *Id.* However, this Court well knows it cannot draw such an inference in movant's favor. On the contrary, the Court must draw the inference in Morrissey's favor that this episode was targeted harassment. After all, Morrissey was repeatedly point-blank told she did have to fill the extra shift, as cited above. A jury could reasonably infer that the order to work beyond her shift was both *needless* and *targeted* at Morrissey since the supposed "need" to mandate entirely evaporated when Morrissey was out of the picture.

Moreover, Morrissey was not "due" to be mandated (or even "possibly") mandated at all that day, as cited above. Defendants offer no evidence why Morrissey was being mandated more than others this way. Likewise, Defendants have not explained why Morrissey was denied move to the C wing, when others were permitted to select regular 8-hour shifts there. Nor do Defendants offer any reason why they failed to investigate this matter, when they admit their policy was to do so. An employer's departure from standard workplace practices is evidence supporting an inference of retaliatory intentions. *DeFlavis v. Lord & Taylor, Inc.*, 223 Mich. App. 432, 443, 566 N.W.2d 661 (1997); *Ramanathan v. Wayne State University Bd. Of Governors*, 2010 WL 1330290 (Mich. App. 2010), P. Ex. P.

Nor can Defendants explain why non-disability excuses to avoid mandation such as educational or child-care reasons were honored, but Morrissey's request for accommodation was not. In fact, per Defendants, they could and would honor work-hour restrictions, *see* fn. 4, *supra*, so the failure to do so with Morrissey is inexplicable. Defendants also cannot explain why Morrissey was

23

told if she went to "casual" status to avoid mandation she could not be guaranteed hours, like other "casual" nurses got. The differential treatment of similarly situated comparators permits the causal inference of retaliation. *See, e.g., Edwards v. Credit Acceptance Corp.*, 2004 WL 1103773, 9 (Mich.App. 2004), P. Ex. N; *Harrison v. Metropolitan Government of Nashville and Davidson County, Tennessee*, 80 F.3d 1107, 1119 (6th Cir. 1996); *McLemore v. Detroit Receiving Hosp. and University Medical Center*, 196 Mich. App. 391, 493 N.W.2d 441 (1992).

In summary, Plaintiff's retaliation case must go to the jury.

## Summary

Defendants' motion focus very heavily on Plaintiff's disability status, but "The primary object of attention in ADA cases should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." P. Ex. L, 28 C.F.R. § Pt. 35, App. C at 1. The reality is that these Defendants intentionally and explicitly decided they did not have to follow the ADA or PWDCRA, bothering with cumbersome individualized attention to disability accommodation requests and those who insisted on their rights. Defendants' conduct is shameful; this matter amply warrants the time of a fact-finder to establish damages.

SALVATORE PRESCOTT &
PORTER, PLLC

/s/ Sarah S. Prescott

Sarah S. Prescott (P70510)
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplawyers.com

Dated: February 28, 2018

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN

RITA MORRISSEY, an individual,

     Plaintiff,

v.

LAUREL HEALTH CARE COMPANY, a
Foreign Profit Corporation, and OAK
HEALTH CARE INVESTORS OF
COLDWATER, INC. d/b/a THE
LAURELS OF COLDWATER and d/b/a
CARRIAGE INN CONVALESCENT
CENTER, a Domestic Profit Corporation,

     Defendants.

Case No. 17-cv-00089-JTN-ESC

Hon. Janet T. Neff
Mag. Ellen S. Carmody

**Certificate of Service**

| | |
|---|---|
| Sarah S. Prescott (P70510) | Karen B. Berkery (P38698) |
| Nakisha N. Chaney (P65066) | Zeth Hearld (P79725) |
| Jennifer B. Salvatore (P66640) | KITCH DRUTCHAS WAGNER |
| SALVATORE PRESCOTT & | VALITUTTI & SHERBROOK |
| PORTER, PLLC | Attorneys for Defendants |
| Attorneys for Plaintiff | One Woodward Ave., Suite 2400 |
| 105 E. Main Street | Detroit, MI 48226-5485 |
| Northville, MI | (313) 965-7448 |
| (248) 679-8711 | karen.berkery@kitch.com |
| prescott@spplawyers.com | zeth.hearld@kitch.com |
| salvatore@spplawyers.com | |
| chaney@spplawyers.com | |

## CERTIFICATE OF SERVICE

     I hereby certify that on March 14, 2018, the foregoing document was electronically filed with the Clerk of the Court using the Court's electronic filing system, which will send notification of such filing to all counsel of record.

Dated: March 14, 2018

/s/ Tara L. Lank

Tara L. Lank, Legal Secretary